UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 6:16-CV-932-ORL-28-GJK

DUSTIN SAUDER,
and all others similarly situated
    Plaintiff,
vs.
LEO'S CONCRETE SPECIALTIES, INC.,
a Florida Limited Liability Company, and
LEO BADALAMENTI, individually and as
an officer of Leo's Concrete Specialties, Inc.
    Defendants    /

## AMENDED MOTION FOR SUMMARY FINAL JUDGMENT AND MEMORANDUM OF LAW

Defendants, LEO'S CONCRETE SPECIALTIES, INC. and LEO BADALAMENTI, by and through their undersigned counsel, pursuant to Rule 56, Federal Rules of Civil Procedure, hereby move for Summary Final Judgment against Plaintiff, DUSTIN SAUDER and as grounds therefore would respectfully show the Court as follows:

### I.   INTRODUCTION

In Plaintiff's Complaint, Plaintiff alleges that he is entitled to damages as a result of Defendants' failure to pay overtime wages in violation of the Fair Labor Standards Act, 29 U.S.C. §201, et sq. ("FLSA").

### II.   FACTUAL BACKGROUND

Plaintiff's Complaint, together with subsequent discovery responses, alleges that Plaintiff was not compensated for overtime work while he was employed with LEO'S CONCRETE SPECIALTIES, INC. from March of 2013 through March of 2016. In the Plaintiff's Interrogatory responses, he claims that over a period of 750 work days, the Defendants failed to compensate him for $18,435.00 as and for overtime compensation and this is the amount he is seeking as damages for violations of the FLSA.

However, at no time during the discovery process has Plaintiff provided any records or any documentation that Plaintiff actually worked the overtime hours he is claiming. The only "proof" he has provided has been his vague recollection testimony at deposition, which does not support the damage calculation provided in his Interrogatory responses. His calculations assume that he worked the same hours every day of each and every week without taking into account any days he arrived late to work or any days on which he called in sick, or days where he did not work full days.

In his deposition taken July 25, 2017, the Plaintiff testified as follows (portions of transcript attached as Composite Exhibit "A"):

| | |
|---|---|
| DEFENDANT'S ATTORNEY: | And did you keep track of the number of sick days for the coming up period. |
| DUSTIN SAUDER: | No. |
| DEFENDANT'S ATTORNEY: | And when you took a sick day off, from what I understand you to say, you knew you weren't getting paid that, right? |
| DUSTIN SAUDER: | This is true. |
| DEFENDANT'S ATTORNEY: | All right. Were you ever late for work? |
| DUSTIN SAUDER: | Yes. There's been times I've been late to work.<br>(Sauder Deposition, page 18 lines 15-25; page 19, lines 1-3.) |

In the same deposition, the Plaintiff later testified as follows:

| | |
|---|---|
| DEFENDANT'S ATTORNEY: | And when you did your calculations, did you factor in times you were late or times you missed work? |
| DUSTIN SAUDER: | No, sir.<br>(Sauder Deposition, page 49, lines 20-23.) |

2

The Plaintiff testified that he has been late to work and that he has missed work days because of illness. However, neither of these factors is considered in the Plaintiff's damages calculations.

In the July 25, 2017 deposition, the Plaintiff testified that he had no records to support his damage calculations.

| | |
|---|---|
| DEFENDANT'S ATTORNEY: | In the course of this litigation, there have been hours thrown around that you believe you were not compensated for. Do you have any paperwork that you've used in order to calculate hours? |
| DUSTIN SAUDER: | I – I don't have paperwork, no. |
| DEFENDANT'S ATTORNEY: | You mentioned that you had about 90 percent of your pay stubs? |
| DUSTIN SAUDER: | That's correct. |
| DEFENDANT'S ATTORNEY: | Did you go back and look at your pay stubs to look and perhaps write on them or do something where you said this pay week I was shorted this much? |
| DUSTIN SAUDER: | No. |
| DEFENDANT'S ATTORNEY: | In overtime? |
| DUSTIN SAUDER: | No.<br>(Sauder Deposition, page 44, lines 17-25; page 45, lines 1-5.) |

Nor has Plaintiff challenged the accuracy of the records and documentation provided by the Defendants during the Discovery process. In fact, the Plaintiff has stated that during his employment with LEO'S CONCRETE SPECIALTIES, INC., any concerns he raised concerning his compensation for hours worked were resolved by LEO'S CONCRETE SPECIALTIES, INC. at the time.

| | |
|---|---|
| DEFENDANT'S ATTORNEY: | And did you ever notice on any of the paychecks that there were, perhaps, fewer hours than you remember working? |
| DUSTIN SAUDER: | Yes, sir. |
| DEFENDANT'S ATTORNEY: | And if you – when that happened, did you report that to Jeff? |
| DUSTIN SAUDER: | Yes, sir. |
| DEFENDANT'S ATTORNEY: | And when you reported it to Jeff, did he take any steps to look into it? |
| DUSTIN SAUDER: | He reported it to Janet and then Janet would be in contact with me. |
| DEFENDANT'S ATTORNEY: | And the times that this happened, were they many times? |
| DUSTIN SAUDER: | It's definitely a handful of times, yes. |
| DEFENDANT'S ATTORNEY: | So maybe five times in the course of your employment? |
| DUSTIN SAUDER: | Ten. |
| DEFENDANT'S ATTORNEY: | Ten times? And in those ten instances, were you satisfied that between Jeff and Janet they corrected any error that you discovered? |
| DUSTIN SAUDER: | Yes |
| DEFENDANT'S ATTORNEY: | Was there every (sic) any discussion with Jeff or Janet about not being compensated for having to drive to the shop? |
| DUSTIN SAUDER: | No, sir<br>(Sauder Deposition, page 25, lines 19-25; page 26, lines 1-18.) |

Plaintiff's responses to written discovery confirm that his damage demands are merely speculative. DUSTIN SAUDER provided no documents supporting his damage claims in

4

response to the Defendants' Request for Production of Documents. In responding to written interrogatories asking for his calculation of damages, DUSTIN Sauder's only response is as follows (Plaintiff's Amended Answers to Defendant's First Set of Interrogatories attached hereto as Exhibit "B"):

Mr. Sauder's calculation of the monies owed per the letter of March 15, 2016 is as follows:

"From March 9, 2013 through October 23, 2014, at an overtime rate of $22.50/hr.
 • 380 days of violation x $22.50/hr. = $8,850.00
From October 24, 2014 through July 22, 2015, Mr. Sauder was paid at a rate of $16/hr.
 • 180 days of violation x $24/hr. = $4,320.00
From July 23, 2015 through November 25, 2015, Mr. Sauder was paid at a rate of $18/hr.
 • 100 days violation x $27/hr. = $2,700.00
From November 26, 2015 through Present, Mr. Sauder is paid at a rate of $19/hr.
 • 90 days of violation x $28.50/hr. = $2,565.00
**As a result the sum of $18,435.00 is owed.**"

These calculations do not take into consideration the days on which Mr. Sauder was late or absent from work, although he has admitted that, on certain days, he was late for work and/or absent from work. As stated above, these calculations do not take into consideration different job assignments and duties on different days. In fact, these calculations are based solely on the number of calendar days in the given year and are not based on any record or other evidence. Mr. Sauder's job related to concrete pours for things like sidewalks and driveways. Not every day were there jobs. Also the weather could have prevented concrete pours being done.

Finally, Plaintiff states in a letter dated April 1, 2016, that he has received payment from LEO'S CONCRETE SPECIALTIES, INC. "for all wages owed to me". (A copy of said letter is attached hereto as Exhibit "C").

Notwithstanding what DUSTIN SAUDER indicates is the basis of his claim, not one person similarly situated as an employee of LEO'S CONCRETE SPECIALTIES, INC. who has

been deposed supports his claim that LEO'S failed to properly pay overtime wages. Of note, is the fact that LEO'S has over 100 employees and yet Mr. Sauder was unable to certify a class for his action.

### III. ARGUMENT AND AUTHORITIES

The Plaintiff is not entitled to recover damages which cannot be precisely determined. "There must be some reasonable basis in the evidence to support the amount of damages awarded; furthermore it is incumbent upon the party seeking damages to present evidence to justify an award of damages in a definite amount" Camper Corral, Inc. v. Peratoni, 802 So2d 900 (Fla. 2nd DCA 2001). "Awards for damages must be supported by evidence and cannot be based on speculation and conjecture" John Hancock Mutual Life Insurance Company, v. Mark-A, INC. 324 So.2d 674 (Fla.2nd DCA 1975). It is clear from all discovery responses, including the Plaintiff's deposition testimony that the **only** evidence Plaintiff has to support his claim for damages is speculative and far from definite.

"Damages cannot be based on speculation, conjecture or guesswork" Swindell v. Crowson 712 So2d 1162 (Fla. 2nd DCA 1998). The facts in the Swindell case are almost identical to the facts in the present case. In Swindell, the Plaintiff was seeking damages for unjust enrichment based on unpaid wages. The appellate court stated that "damages cannot be based on speculation". As is our present case, the Plaintiff had no documents or other evidence to support her claims that she had worked for certain time periods on certain days. In fact, she admitted that she guessed and/or estimated the amount of time for which she was claiming unpaid wages. In our present case, the Plaintiff has likewise admitted that he guessed and/or estimated that dates and times for which he now claims he is entitled to overtime compensation.

It is well settled in Florida law that a plaintiff must prove each and every material allegation of his complaint which is denied by a party defending against the claims and this includes providing "...evidence regarding a reasonable certainty as to (the) amount of damages, and a plaintiff's claim cannot be based upon speculation or guesswork" Gonzalez v. Barrenechea 170 So3rd 13 (Fla 3rd DCA 2015).

The recovery of uncertain and speculative damages is also prohibited by Federal case law. Damages which are uncertain, contingent or speculative cannot be recovered because they are not susceptible of the exacting proof required to fix liability. Tractebel Energy Marketing v. AEP Power Marketing, Inc., 487F.3$^{rd}$89 (2$^{nd}$Cir.2017); Weyerhaeuser Co. v. Brantley, 510 3rd 1256 (10th Cir. 2007). Federal courts have consistently applied state law regarding the prohibition of speculative and uncertain damages. McClaran v. Plastic Industries, Inc., 97 F. 3rd 347 (9th Cir. 1996) and Tractebel, supra and Weyerhaeuser, supra.

While certain Federal cases do allow for the recovery of estimated and uncertain damages, speculation evidence is only allowed where "the employer's records are inaccurate or inadequate" Anderson v Mt. Clemes Pottery Co., 328 U.S. 680 (1946) and Day v. Celadon Trucking Services, 827 F. 3rd 827 (8th Cir. 2016). Clearly these cases are distinguished by the facts and circumstances of this case where the Defendant, LEO'S CONCRETE SPECIALTIES, INC., maintained records which have been produced to Plaintiff and Plaintiff's counsel during the discovery phase of this litigation.

Estimated damages should only be allowed when employer's payroll records are not trustworthy. Brand v. Comcast Corporation, 135 F. 3rd 713 (E.D. ILL., 2015). Plaintiff, DUSTIN SAUDER, admitted during his deposition that any complaints or concerns he had while he was employed by Defendant, LEO'S CONCRETE SPECIALTIES, INC., were resolved

(Sauder Deposition, page 25, lines 19-25; page 26, lines 1-18). "In context of establishing damages for unpaid wages or overtime under FLSA in cases where employer kept time records that comply with FLSA, the accurate time records will establish the amount of damages and the general rule that precludes recovery of uncertain and speculative damages is appropriate "*Brand, supra,* at 741.

## IV. CONCLUSION

Plaintiff's claims for damages are not supported by any relevant facts, records or documentation, but are instead calculations based solely by adding up calendar days without subtracting days Leo's Concrete Specialties Inc., did not have jobs, could not pour concrete due to weather conditions, or days Mr. Sauder was late or missed work. As a consequence, Defendants LEO'S CONCRETE SPECIALTIES, INC., and LEO BADALEMENTI are entitled to Summary Final Judgment against Plaintiff, DUSTIN SAUDER, as to all counts in this matter due to Plaintiff not being able to present evidence that is certain and not based on estimates and speculation.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 26, 2017, I served a true and correct copy of the foregoing Amended Motion for Summary Final Judgment and Memorandum of Law via U.S. Mail/Email to:

Maurice Arcadier, Esq.
Arcadier & Associates, P.A.
2815 E. New Haven, Suite 304
Melbourne, FL  32904
Email: office@wamalaw.com
Email: wood@wamalaw.com

RAYMOND J. ROTELLA, ESQ.
Florida Bar No. 0157951
KOSTO & ROTELLA, P.A.
P.O. Box 113
Orlando, Florida  32802
Telephone: (407) 425-3456
Facsimile:  (407) 423-9002
Email: rrotella@kostoandrotella.com
Email: dmeyer@kostoandrotella.com
*Attorneys for Defendants*

Case 6:16-cv-00932-JA-GJK   Document 58   Filed 09/26/17   Page 9 of 15 PageID 260

DUSTIN SAUDER vs. LEO'S CONCRETE SPECIALTIES, INC.
DUSTIN SAUDER
18..21

Page 18

1  A. Prior obligations; correct.
2  Q. All right. You said that there might be times
3 when you couldn't show up at 5:30 a.m. because you were
4 sick?
5  A. There was sick days; that is correct.
6  Q. All right. Was that one of the company
7 policies to pay for sick days?
8  A. No. No. Who paid for a sick day?
9  Q. Okay. I'm just asking.
10  A. No. No.
11  Q. And when you took sick days off, how did you
12 record that you were taking the sick days off?
13  A. I would report to Jeff, and he would record it
14 to the office.
15  Q. And did you keep track of the number of sick
16 days for the coming up period?
17  A. No.
18  Q. Is there anything that you have in the way of
19 records that would tell us the sick days that you took
20 off?
21  A. No.
22  Q. And when you took a sick day off, from what I
23 understood you to say, you knew you weren't getting paid
24 that day; right?
25  A. This is true.

Page 19

1  Q. All right. Were you ever late to work?
2  A. Yes. There's been times I've been late to
3 work.
4  Q. And when you were late for work, how did you
5 find out where the job site was?
6  A. I would have to call in the morning. But
7 usually when I was late for work, I was driving my own
8 vehicle. Because it was at a time when I did not have
9 the vehicle.
10  Q. So there was a period of time when you didn't
11 have a vehicle that you drove your own vehicle. Do you
12 remember how long a period of time that was?
13  A. No, sir.
14  Q. Do you know why it is that you didn't have a
15 vehicle during that period of time?
16  A. No, sir.
17  Q. Was it taken away from you because of your --
18  A. Yes, sir.
19  Q. -- constant tardiness or lateness?
20  A. No. That wasn't the case.
21  Q. Why was it taken -- the vehicle taken away?
22  A. You're asking the wrong guy, sir. I don't
23 know.
24  Q. Nobody told you?
25  A. No.

Page 20

1  Q. What was the process for you to return the
2 vehicle once you were told that you no longer --
3  A. They would pick it up at my house because I
4 took a day off sick.
5  Q. Okay. Do you remember the specific instance or
6 time when you took a day off sick, and they came to the
7 house and took the truck?
8  A. Just about every single time I took a day off
9 sick.
10  Q. So approximately how many times did you take
11 days off sick --
12  A. Four.
13  Q. And do you remember the months and the year of
14 the four sick days?
15  A. No, sir.
16  Q. What kind of sickness did you typically have?
17  A. I have an upset stomach, and that still lingers
18 to this day. In the mornings it's really rough. And
19 also I have migraines, which I still have -- I go to the
20 doctor for.
21  Q. And you know -- thank you for reminding me. I
22 should have asked you this question. Is there anything
23 in the way of medication that you're taking today that
24 in any way affects your ability to think or see or hear?
25  A. No, sir.

Page 21

1  Q. Okay. Are you on any medications today?
2  A. Yes, sir.
3  Q. What medications are you on?
4  A. I take meloxicam, anti-inflammatory for my
5 back.
6  Q. Is that it?
7  A. And I also take ten milligram Lortabs for my
8 back usually in the evening for rest.
9  Q. Okay. Now, while you were with Leo's, do you
10 understand they had a drug-free policy?
11  A. This is true.
12  Q. Did you take any drugs that weren't prescribed
13 while you were with Leo's?
14  A. No, sir.
15  Q. Did you during your tenure with Leo file for
16 workers' comp?
17  A. At the end. I got hurt on the job.
18  Q. And what kind of hurt did you get?
19  A. I was pushing a wheelbarrow, plastic caught my
20 foot, and it literally jolted my back. I took a day
21 off. They immediately suggested that I go to their
22 doctor, and that is what I did.
23  Q. And did you understand that they filed a
24 workers' compensation claim for you?
25  A. I wasn't aware of it at the time. But then


EXHIBIT COMPOSITE "A"

DUSTIN SAUDER vs. LEO'S CONCRETE SPECIALTIES, INC.
DUSTIN SAUDER

46..49

Page 46

1   A.  As far as?
2   Q.  On a daily basis?
3   A.  Depends on location. I could be in Titusville.
4 I could be in Vero. I could be in Viera where is most
5 of our work. So it was just an average. I mean, like I
6 said, we also did work in Daytona, New Smyrna. So, I
7 mean, depends.
8   Q.  And what was the average that you in your mind
9 calculated to drive the men to the job site and drive
10 the men back to the shop?
11   A.  It was a half-hour at night and it was an hour
12 in the morning.
13   Q.  And why would it be more in the morning than --
14   A.  Because I had time at the shop loading up
15 material, picking up the guys, fueling up the truck, and
16 then driving to the job site.
17   Q.  Am I understanding you to say then that when
18 you picked -- I'm sorry -- when you drove the men back
19 to the shop, it was purely to drop them off?
20   A.  Or broken tools.
21   Q.  Or get another tool that was broken?
22   A.  Yeah. Dropping off the trowel machine or
23 something or a trailer which I had been pulling around.
24   Q.  But that wouldn't be every day driving a
25 trailer around; right?

Page 47

1   A.  It's at least once a week.
2   Q.  Okay.
3   A.  Like I said, it was the Georgia buggies, those
4 would be on a trailer as well.
5   Q.  What I'm trying to be sure I have in my mind is
6 an understanding that you didn't go back on your own to
7 try and calculate the number of hours that you believe
8 you were not compensated for overtime?
9   A.  I'm uncomfortable with that answer, honestly.
10 I mean, I've -- I played a part in it.
11   Q.  Tell me what part you played.
12   A.  I worked with the check stubs, sat down,
13 figured out roughly how much time I spent. I mean, I'm
14 not sure what you're looking for. That's my answer.
15   Q.  I'm not trying to trick you here. I'm just
16 trying to find out what records you have available that
17 I could look at in order to determine --
18   A.  I don't -- I don't have any records anymore.
19   Q.  What happened to the records?
20   A.  Like, I don't know.
21   Q.  Did you move and lose them, or did you throw
22 them away?
23   A.  They've gotten misplaced.
24   Q.  Prior to misplacing them, did you deliver
25 records to your lawyer?

Page 48

1   A.  I have.
2   Q.  Can you describe for me the records you
3 delivered to your lawyer?
4   A.  My check stubs.
5       MR. WOOD: And we've given those to you.
6   They're the same ones you gave to us. We have had
7   many conversations on discovery issues in the past;
8   you recall those. And I produced all of the copies
9   of all of the pay stubs -- which were actually
10  produced by you to me -- ahead of time.
11      As far as calculations, I'm hesitant with his
12  testimony which goes into communications between us.
13      MR. ROTELLA: Okay. I haven't asked about
14  communications between you. I've been very careful
15  of not doing that.
16      MR. WOOD: I know.
17 BY MR. ROTELLA:
18   Q.  But what I'm trying to understand is first I
19 understood he had no records and they were lost. And
20 now my understanding before they were lost or misplaced
21 you made duplicates --
22   A.  I believe you were asking about handwritten
23 records. And, yes, I have handwritten records of
24 writing down hours and that sort of thing trying to
25 figure out how much I actually lost in this entire

Page 49

1 process. But I do not have them anymore. So all I have
2 at this point is pay stubs, which I have given to my
3 lawyer.
4   Q.  So the handwritten records you didn't deliver
5 to your lawyer?
6   A.  No, sir. That was just for my own personal
7 knowledge to find out.
8   Q.  And the handwritten records that you made, was
9 that by going back to look at all the pay stubs?
10   A.  That is true.
11   Q.  Okay. So as you were working on a weekly or
12 daily basis, you weren't, for example, having a diary
13 saying today is November 4, 2005 --
14   A.  No, sir.
15   Q.  -- 2015 --
16   A.  No, sir.
17   Q.  -- and I didn't get these hours paid. Nothing
18 like that occurred?
19   A.  No, sir.
20   Q.  Okay. And when you did your calculations, did
21 you factor in times you were late or times you missed
22 work?
23   A.  No, sir. Because when I was doing them by hand
24 and for myself, it was just for myself just to get an
25 estimate.



Orange Legal
800-275-7991

DUSTIN SAUDER vs. LEO'S CONCRETE SPECIALTIES, INC.
DUSTIN SAUDER

42..45

Page 42

1  Q. Okay. Did he ever act as a foreman?
2  A. No.
3  Q. Did he speak English?
4  A. Yes.
5  Q. And did you ever talk to Steve Rios about
6  joining into this lawsuit?
7  A. No, sir. I didn't speak to anybody about
8  joining this lawsuit.
9  Q. Not a person?
10 A. No, sir.
11 Q. You never spoke to Mr. Pender?
12 A. No, sir.
13 Q. Never spoke to --
14 A. He still works for Leo's. I wouldn't talk to
15 him about it.
16 Q. You never spoke to Charlie Bennett?
17 A. No, sir.
18 Q. You never spoke to, I think I wrote, Dave
19 Woods --
20 A. No.
21 Q. -- to join this lawsuit?
22 A. No.
23 Q. You never spoke to Darryl whatever his last
24 name was to join in on your lawsuit?
25 A. No, sir.

Page 43

1  Q. You never spoke to Rob Atkins about joining
2  into this lawsuit?
3  A. No. And, actually, the only two people I spoke
4  to were Stephan Scofield, and Billy and I don't even
5  know his last name.
6  Q. Jabaluski or Jabluski?
7  A. Yeah. Sounds great. Yeah, that's it. Because
8  they are not employees of Leo at that time.
9  Q. So if I am understanding you correctly, are you
10 saying to us that if someone was still employed with
11 Leo's, you didn't ask them to join this lawsuit?
12 A. That is correct.
13 Q. And at the time you asked Steve Scofield and
14 Billy Jabluski -- I'll get you that spelling at the
15 end -- they were not employed by Leo's?
16 A. That is correct.
17 Q. Now, Billy Jabluski didn't opt into this
18 lawsuit. Do you know why?
19 A. No, sir. I haven't spoken to him since the day
20 he signed the paper.
21 Q. Do you know where he's located?
22 A. No, sir.
23 Q. Do you ever see him on jobs?
24 A. No, sir.
25 Q. Since the lawsuit has started, have you ever

Page 44

1  spoke to any employees at Leo's about joining the
2  lawsuit?
3  A. No, sir.
4  Q. Have you gone to any other former employees of
5  Leo's about joining this lawsuit?
6  A. No, sir.
7  Q. You mentioned Charlie Bennett was a lead guy
8  when Jeff was out. Did you consider him to be superior
9  to you?
10 A. We were the same.
11 Q. Did he have a longer term of work with Leo's
12 than you?
13 A. That is true.
14 Q. So Charlie Bennett would have driven a truck
15 and been a foreman?
16 A. That is correct.
17 Q. Okay. In the course of this litigation, there
18 have been hours thrown around that you believe you were
19 not compensated for. Do you have any paperwork that
20 you've used in order to calculate hours?
21 A. I -- I don't have paperwork, no.
22 Q. You mentioned you had about 90 percent of your
23 pay stubs?
24 A. That's correct.
25 Q. Did you go back and look at your pay stubs to

Page 45

1  look and perhaps write on them or do something where you
2  said this pay week I was shorted this much?
3  A. No.
4  Q. In overtime?
5  A. No.
6  Q. Because that's what we're principally focused
7  on here.
8  A. For this reason only is because I didn't even
9  know it was a circumstance. I didn't -- I don't know
10 the law. I didn't even -- I just kept track of my pay
11 stubs only for the specific reason is I've always kept
12 my pay stubs. Because when I was in the union, I had to
13 compare my time with my benefits. I kept Leo's pay
14 stubs just because it was a habit.
15 Q. Now, tell me in your own words what you
16 understand your lawsuit's about.
17 A. Unpaid hours.
18 Q. And what are those unpaid hours?
19 A. From driving to the job site and bringing guys
20 back and dropping them off at the shop.
21 Q. And that's it? There's nothing else that
22 you're seeking for unpaid hours?
23 A. No, sir.
24 Q. To just drive the men to the job site and drive
25 the men back to the shop, would the hours differ?



Orange Legal
800-275-7991

Case 6:16-cv-00932-JA-GJK  Document 58  Filed 09/26/17  Page 12 of 15 PageID 263

DUSTIN SAUDER vs. LEO'S CONCRETE SPECIALTIES, INC.
DUSTIN SAUDER
22..25

### Page 22

1 what I got back, I had to -- there was paperwork that I
2 a had to sign.
3   Q.  When you say you got back, what do you --
4   A.  Got back from their doctor, back to the
5 office --
6   Q.  You came back to the office?
7   A.  That is true. They drove me there to the
8 doctor and drove me back to my vehicle.
9   Q.  Who was it that drove you there?
10  A.  His name's Kevin.
11  Q.  Did you know Kevin?
12  A.  Not well.
13  Q.  And when you got back, you say they gave you
14 paperwork?
15  A.  This is true.
16  Q.  And it was for workers' comp?
17  A.  Yes, sir. I believe so.
18  Q.  And did you help them to complete that workers'
19 comp information?
20  A.  I don't understand.
21  Q.  The paperwork they gave you, was it filled out?
22  A.  No. I can't recall.
23  Q.  You don't know?
24  A.  I couldn't --
25  Q.  But when you came back, did I understand you to

### Page 23

1 say you knew a workers' comp claim was being processed?
2   A.  Yeah.
3   Q.  Okay.
4   A.  I guess so.
5   Q.  And were you required to go back to the doctor
6 again?
7   A.  Yes. Follow-up.
8   Q.  And what was the follow-up? When was that?
9   A.  Don't know. It was ten days after the accident
10 happened.
11  Q.  And did you go to the follow-up?
12  A.  Yes, I did.
13  Q.  And were you approved for workers' comp?
14  A.  Yes.
15  Q.  And did you actually receive workers' comp
16 benefits?
17  A.  I collected one check for the time I was off.
18  Q.  Because of that workers' compensation claim,
19 were you advised that you were not to show up at work by
20 the doctor?
21  A.  Yeah. He told me to take ten days off or light
22 duty, which there's no light duty in concrete.
23  Q.  And did you actually stay away from Leo's
24 Concrete for ten days and not do any work?
25  A.  This is true.

### Page 24

1   Q.  And do you remember when it is that you applied
2 for workers' comp?
3   A.  No, sir.
4   Q.  Was it near the end of your employment?
5   A.  It's when I got hurt was at the end of my
6 employment.
7   Q.  Could it have been March of 2016?
8   A.  Sure. I don't know.
9   Q.  Do you have any paperwork that shows --
10  A.  No, sir. I do not have any paperwork from any
11 of that stuff.
12  Q.  No canceled checks?
13  A.  No, sir.
14  Q.  You have no forms? No?
15  A.  No, sir.
16  Q.  Do you have any letters approving the workers'
17 comp?
18  A.  No, sir.
19  Q.  Okay. Now, the time you took off from Leo's
20 for those ten days, did you get a paycheck?
21  A.  From Leo's?
22  Q.  Correct.
23  A.  No, sir.
24  Q.  Do you remember what the amount of the check
25 was that you got for workers' comp?

### Page 25

1   A.  Honestly, no.
2   Q.  Do you keep records as a habit of -- for
3 example, paychecks and things like that?
4   A.  I keep check stubs.
5   Q.  Do you have your check stubs from when you were
6 with Leo's?
7   A.  About 90 percent of them.
8   Q.  Let me talk to you for a moment about your
9 typical habit when you would get a paycheck from Leo's.
10  A.  Mm-hmm.
11  Q.  You said you would go every Friday to pick your
12 paycheck up; right?
13  A.  Yes.
14  Q.  Okay. When you picked up the paycheck, did you
15 look at it to determine whether or not in your mind you
16 felt you were being compensated for all the hours you
17 worked?
18  A.  Yes, sir.
19  Q.  And did you ever notice on any of the paychecks
20 that there were, perhaps, less hours than you remember
21 working?
22  A.  Yes, sir.
23  Q.  And if you -- and when that happened, did you
24 report that to Jeff?
25  A.  Yes, sir.



Case 6:16-cv-00932-JA-GJK   Document 58   Filed 09/26/17   Page 13 of 15 PageID 264

DUSTIN SAUDER vs. LEO'S CONCRETE SPECIALTIES, INC.
DUSTIN SAUDER

26..29

Page 26

1 Q. And when you reported it to Jeff, did he take
2 any steps to look into it?
3 A. He reported it to Janet, and then Janet would
4 be in contact with me.
5 Q. And the times that this happened, were they
6 many times?
7 A. It's definitely a handful of times, yes.
8 Q. So maybe five times in the course of your
9 employment?
10 A. Ten.
11 Q. Ten times? And in those ten instances, were
12 you satisfied that between Jeff and Janet they corrected
13 any error that you discovered?
14 A. Yes.
15 Q. Was there every any discussion with Jeff and
16 Janet about not being compensated for having to drive to
17 the shop?
18 A. No, sir.
19 Q. Okay. When you met Jeff at the shop at 5:30
20 a.m., other than meeting Jeff and finding out where you
21 were supposed to go and picking up some crew members,
22 what else did you do at the shop?
23 A. Well, we found out where we were going. We
24 would find out what crew would be with me. And we would
25 either pick up a trowel machine depending if we needed

Page 27

1 it for that job. We swapped wheelbarrows out daily; if
2 we needed plywood for those wheelbarrows. We would pick
3 up materials needed for that job for that particular
4 day.
5 Q. You said that you would swap out wheelbarrows
6 every day and pick up --
7 A. Because some may have been left on a job. And
8 we would have four on one truck, none on another, two on
9 one truck, one on one truck. Sometimes we would have to
10 equal that out to have the efficient amount for the job
11 that we were going to.
12 Q. So let me see if I'm understanding this
13 situation here. It's 5:30 in the morning.
14 A. Mm-hmm.
15 Q. You show up with your truck.
16 A. Mm-hmm.
17 Q. Jeff's there.
18 A. That's correct.
19 Q. Are there any other concrete people there who
20 drove trucks?
21 A. Yeah. The other drivers.
22 Q. And how many approximate trucks would show up
23 at 5:30 with drivers --
24 A. Five.
25 Q. -- involved in concrete?

Page 28

1 A. Five of us.
2 Q. Five? So there would be five of you, plus
3 there would be men showing up who were finishers but not
4 foremen?
5 A. Yes.
6 Q. Okay. And at that point, Jeff would determine
7 who gets what crew member?
8 A. That's correct.
9 Q. Okay. And at that point, you would look at
10 your truck and say, hey, I'm missing a wheelbarrow, go
11 look at another truck that's got two wheelbarrows in it,
12 and take one of those wheelbarrows and put it in your
13 truck; is that what you told me?
14 A. Yes.
15 Q. I mean, when you said swap wheelbarrows, you
16 didn't mean that there was a place on Thor Avenue where
17 there was a whole inventory of wheelbarrows hanging
18 around; right?
19 A. Yes, there is.
20 Q. There is?
21 A. Yes.
22 Q. Okay. So the only time you would go get a
23 wheelbarrow is if another person with a truck didn't
24 have multiple wheelbarrows; right?
25 A. Or plywood or --

Page 29

1 Q. Stay with wheelbarrows for a moment.
2 A. Okay. Stick with wheelbarrows?
3 Q. Yeah.
4 A. Yes, we had wheelbarrows at the shop.
5 Q. And so if you didn't see extra wheelbarrows in
6 any of the other four trucks, you would go get a
7 wheelbarrow?
8 A. We would have to, yes.
9 Q. And how far did you have to go to get a
10 wheelbarrow?
11 A. In the shop at Thor Avenue.
12 Q. How far was that?
13 A. It's --
14 Q. Adjacent?
15 A. From the driveway to in the shop, so 15 steps.
16 Q. Okay. So it wasn't an arduous task; in other
17 words?
18 A. No, sir.
19 Q. How much time would it take you to get a
20 wheelbarrow?
21 A. For just the wheelbarrow, or everything I
22 needed for the day?
23 Q. No. Stay with the wheelbarrow for the moment.
24 A. It would take me five minutes to go pick up a
25 wheelbarrow.





UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

DUSTIN SAUDER,
    And all others similarly situated,
  Plaintiff(s),

vs.                         CASE NO.: 6:16-CV-932-ORL-28-GJK

LEO'S CONCRETE SPECIALTIES, INC.,
  a Florida Limited Liability Company
LEO BADALAMENTI,
  Individually and as officer of Leo's Concrete Specialties, Inc.

Defendants.
_____/

## PLAINTIFF'S UNVERIFIED SECOND AMENDED ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff, DUSTIN SAUDER, by and through the undersigned attorney, and per the Court's Order [DE 37] hereby provides his unverified Supplemental Answers to Defendant's First Set of Interrogatories Numbers 1, 9, and 12, as follow;

    1. Mr. Sauder's calculation of the monies owed per the letter dated March 15, 2016 is as follows:

- From March 9, 2013 through October 23, 2014, at an overtime rate of $22.50/hr.
  - 380 days of violation x $22.50 = $8,850.00
- From October 24, 2014 through July 22, 2015, Mr. Sauder was paid at a rate of $16/hr.
  - 180 days of violation x $24 = $4,320.00
- From July 23, 2015 through November 25, 2015, Mr. Sauder was paid at a rate of $18/hr.
  - 100 days of violation x $27/hr = $2,700.00
- From November 26, 2015 through Present, Mr. Sauder is paid at a rate of $19/hr.
  - 90 days of violation x $28.50/hr = $2,565.00

As a result the sum of $18,435.00 is owed.



EXHIBIT "C"

Leo's Concrete Specialties, Inc.
521 Thor Avenue SE
Palm Bay, Florida 32909
Phone: 321-951-7638
Fax: 321-728-1053

April 1, 2016

In signing below I acknowledge that I voluntarily left my employment at Leo's Concrete Specialties, Inc. and was not discharged. I have also received my final check for all wages owed to me.

Dustin Sauder